## LICENSE AGREEMENT

Dated as of: October 6, 2005

| | | |
|---|---|---|
| 1. | **Licensor:** | RST (2005) Inc.<br>c/o Chapman, Bird, Grey & Tessler, Inc.<br>1990 South Bundy Drive, Suite 1200<br>Los Angeles, CA 90025, |
| | **Licensee:** | Research In Motion Limited<br>185 Columbia Street West<br>Waterloo, Ontario N2L 5Z5<br>Canada |
| 2. | **Artist:** | Mick Jagger, Keith Richards, Charlie Watts and Ron Wood in their capacity as the musical group "The Rolling Stones" |
| 3. | **Licensed Property:** | (a)    the trademark "The Rolling Stones" (the "Group Name");<br><br>(b)    the trademark of the tongue and lips logo in the designs attached hereto as Exhibit A (the "Logo");<br><br>(c)    the name of Artist's current concert tour (the "Tour"), which is "A Bigger Bang," and the logo for the Tour, if any;<br><br>(d)    photographs of Artist provided by Licensor to Licensee under this Agreement ("Licensed Photographs"), including the front cover album artwork (the "Album Cover") of the album "A Bigger Bang" (the "Album"), but only for the use for which Licensor provided the applicable photograph to Licensee; and<br><br>(e)    a visual clip of up to 60 seconds of Artist's concert footage as provided by Licensor to Licensee (the "Video Clip"). |
| 4. | **Licensed Product:** | A limited edition Blackberry wireless telephone (the "Telephone") to be initially launched in the United States and secondarily launched thereafter in Canada and the United Kingdom. Licensor hereby agrees and acknowledges that there may be more than one model of the Telephone in order to accommodate different wireless technologies and carriers. |
| 5. | **Territory:** | World. |
| 6. | **Term:** | Eighteen (18) months commencing on the date of this Agreement. |
| 7. | **Sell-Off Period** | Six (6) months commencing upon the end of the Term. |
| 8. | **Licensing Fee** | Licensee shall pay Licensor one million dollars ($1,000,000) for the rights granted herein in the Licensed Properties, payable as |

| | | |
|---|---|---|
| | | follows $500,000 (the "First Installment") will be payable upon the execution of this Agreement, and the remaining $500,000 shall be due on December 1, 2005, provided that Licensee's obligation to pay such second installment of the Licensing Fee shall be postponed if at the time the installment comes due, Licensor is in breach of this Agreement, including paragraph 2(d) of Exhibit B attached hereto with respect to the approval of the Licensed Property embodying in the Telephone, on the housing of the Telephone, on the holster therefor and/or on the packaging for the Telephone. |
| 9. | **Authorized Channel of Distribution:** | The Telephones shall only be sold and distributed through the retail and wholesale channels Licensor normally uses to sell its other telephones, including sales through Internet carrier and other third party websites, tele-sales (including sales through 800 numbers), and as provided in paragraph 5(d) of Exhibit B attached hereto. |
| 10. | **Insurance Amount:** | $5,000,000 |
| 11. | **Payment Method** | Wire transfer of funds to the following bank account:<br><br>Account Name: RST (2005) Inc.<br>Account Number: 178768677<br>HSBC Bank USA<br>445 North Bedford Drive<br>Beverly Hills, California 90210<br>Attention: Ms. Janine Halloway<br>Telephone: (310) 281-4256<br>Fax: (310) 859-1628<br>ABA Number: 122240861 |
| 12. | **Additional Terms:** | The attached Exhibit B (Terms And Conditions) is incorporated herein by this reference. |

By signing below, the parties affirm that they are in agreement with the foregoing and that they have read and understand and agree to be bound by Exhibit B (Terms And Conditions), attached hereto and forming a part hereof. The parties further agree that this Agreement shall also serve as an invoice to Licensee with respect to the First Installment. This Agreement shall not be binding upon Licensor until fully executed and delivered and until Licensor has received the First Installment, and until such time, shall be revocable by Licensor. This Agreement may

be executed in any number of counterparts, each of which shall be deemed an original, and facsimile and emailed copies or photocopies of signatures shall be as valid as originals.

(Licensor)

RST (2005) INC.

By: _____
      Jan N. Favié, Vice President

(Licensee)

RESEARCH IN MOTION LIMITED

By: _____
      (an authorized signatory)
Print Name: _Jim Balsillie_
Title: _Chairman + Co-CEO_

**EXHIBIT A**



**EXHIBIT A**



**EXHIBIT A**



**EXHIBIT A**



<u>EXHIBIT B</u>

**TERMS AND CONDITIONS**

These Terms And Conditions ("this Exhibit") shall be deemed fully incorporated into the Agreement (the "Underlying Agreement") to which this Exhibit is attached, and the Underlying Agreement along with this Exhibit and all other exhibits attached to the Underlying Agreement shall, for the avoidance of doubt, be collectively referred to as the "Agreement." All capitalized terms in this Exhibit shall, unless expressly provided to the contrary in this Exhibit, have the same respective meanings as set forth in the Underlying Agreement. Unless expressly provided to the contrary herein, to the extent that any provision of this Exhibit conflicts with any provision of the Underlying Agreement, the Underlying Agreement shall control.

1.    **CONDITIONAL GRANT OF RIGHTS.**

(a)    Subject to paragraph 2 of this Exhibit, Licensor hereby grants to Licensee, and Licensee hereby accepts, the right and license to utilize during the Term (and not thereafter, except as may be reasonably required during the Sell-Off Period) the Licensed Properties as follows:

(i)    Licensee is granted the right to imprint the Logo on the housing of the Telephone, and agrees to do so, and Licensee is granted the right to imprint the Logo on the holster for the Telephone.

(ii)    Licensee is granted the right to imprint the Group Name, the Logo and a Licensed Photograph of all of the members of Artist on the carton, container, packaging, labels and wrapping materials for the Telephone (individually and collectively, the "Packaging") and in advertising, marketing, display and promotional materials for or related to the Telephone, including, subject to paragraph 7 of this Exhibit, any press releases issued in connection therewith (individually and collectively, the "Ad Materials"). Without limiting paragraph 2(a)(ii) of this Exhibit, Licensor agrees that Licensee shall have the right to authorize third party re-sellers of the Telephone to use the Ad Materials in connection with their advertisement, marketing and promotion of the Telephone.

(iii)    Licensee is granted the right to embed the Licensed Property in the Telephone as splash-screens, screensavers and wallpapers ("Digital Images") to be displayed on the screen of the Telephone. However, the only Licensed Photographs that may be used as Digital Images shall be:

(A)    Licensed Photographs of all of the members of Artist;

(B)    Licensed Photographs of Mick Jagger and Keith Richards;

(C)    Licensed Photographs of each of the four (4) individual members of Artist, provided that an individual Licensed Photograph of each member is also embedded in the Telephone as a Digital Image; and

(D)    The Album Cover, which Licensee agrees shall be embedded in the Telephone as a Digital Image.

(iv)    Licensee is granted the right to use the Video Clip for promotion on outdoor media displays (such as the Times Square outdoor jumbotron), provided that there is no accompanying soundtrack to the Video Clip.

EXHIBIT B

**TERMS AND CONDITIONS**

(b)     For the avoidance of doubt, Licensee shall not use any photograph of a member of Artist using the Telephone, and nothing in this Agreement gives Licensee the right to create a direct endorsement of the Telephone by Artist.

(c)     Further, Licensee shall not sell or authorize the sale of any accessory containing the Licensed Property that is not included with the purchase of the Telephone.

(d)     Licensee shall be entitled to manufacture or authorize the manufacture of initially up to 50,000 copies of the Telephone, with a right to increase this number to such additional number of Telephones as the Licensee may elect based on consumer demand for the Telephone, provided that: (i) no Telephones shall be manufactured after the Term; and (ii) the Licensee shall provide payment of royalties (the "Royalty") to the Licensor equal to $10.00 per Telephone sold which is in excess of the initial 500,000 unit threshold. In such event, the terms of Exhibit C shall apply. Licensee shall only sell and distribute the Telephone only in the Authorized Channel of Distribution.

(e)     All Ad Materials shall include references to the Tour and the Album approved by Licensor in writing, provided, however, that after the Tour Licensee shall have no obligation to make any reference to the Tour in Ad Materials or other Collateral Materials [as defined in paragraph 2(a) of this Exhibit].

2.     **APPROVALS.**

(a)     All of the following (collectively, the "Collateral Material") are subject to the prior written approval of Licensor:

(i)     The use of the Licensed Property in the artwork and designs (including all initial concept preliminary designs, interim modifications, prototypes, and final artwork) of or concerning the Telephone, including the carton, container, packaging, labels and wrapping materials for the Telephone (collectively the "Artwork") and all modifications at any time of any aspect of the Artwork;

(ii)     All advertising, promotional, publicity and display materials bearing any of the Licensed Properties or related to the Licensed Properties in any way (including any press releases issued in connection therewith); and

(iii)     Any edit of the Video Clip or any of the other Licensed Properties.

(b)     Each of the above shall be submitted to Licensor at all stages of development for approval in writing before it is distributed or sold by Licensee. Licensee agrees that it shall not proceed (e.g., continue on to the next stage of development) with the production of the Telephone until Licensee has received Licensor's approval of the applicable material(s) submitted. Licensee shall not alter the approved Collateral Material without the prior written approval of Licensor. Any changes required by Licensor to any Collateral Material shall be made by Licensee. Licensee further agrees that all copies of the Telephone shall be the same as the final prototype rendering approved by Licensor. All Collateral Material not approved by Licensor shall be destroyed by Licensee. Such destruction shall be attested to in a certificate signed by one of Licensee's officers.

EXHIBIT B

**TERMS AND CONDITIONS**

(c)    Licensee shall furnish to Licensor, without charge, the finished Telephone from the first production run, together with all Collateral Material related thereto, promptly after such production run. Licensee shall not sell, ship, or distribute the Telephone until it has been furnished the Telephone to Licensor.

(d)    Unless expressly stated otherwise in the Agreement, Licensor's approvals and consents under the Agreement shall not to be unreasonably delayed, conditioned or withheld.

3.    **CONCERTS ON THE TOUR**:

(a)    Concert Tickets: Provided that the tickets are available for the concerts on the Tour (including concerts on the Tour in Europe, if any) selected by Licensee:

(i)    Licensor shall provide to Licensee, at no charge, an aggregate of forty (40) complimentary tickets at the $150 price level for all such concerts (i.e., not for any one concert); and

(ii)    Licensee will purchase one hundred twenty (120) tickets at the $150 price level and twenty-four (24) tickets at the $475 price level for all such concerts (i.e., not for any one concert).

(b)    VIP Receptions: Subject to availability at the applicable venue, Licensor agrees that Licensee may hold VIP receptions at ten (10) of the concerts with a maximum of twenty-five (25) attendees at each reception. Other than the rental for the room, Licensee will be responsible for all costs of such receptions.

(c)    For the avoidance of doubt, any cancellation of the Tour or any of the concerts on the Tour shall not be deemed a breach of this Agreement by Licensor or give rise to any liability of Licensor to Licensee under the Agreement.

4.    **EXCLUSIVITY**:

(a)    During the Term, Licensor will not license the use of the Licensed Properties or any other photograph, image, trademark or service mark of or related to Artist on any other telephone or personal digital assistant (a so-called "PDA"), the packaging thereof, or in any advertising, promotion or publicity of or for any other telephone or PDA. Further, during the Term, Licensor will not authorize any other manufacturer of telephones or PDAs to hold itself out as a sponsor of the Tour and/or Artist. For the avoidance of doubt, the foregoing does not prohibit the sale of ringtones and Digital Images by anyone and would not prohibit Licensor from entering into a sponsorship agreement with any wireless carrier and/or with any wireless content aggregator anywhere in the Territory.

(b)    Notwithstanding paragraph 4(a) of this Exhibit or anything contained in the Agreement to the contrary, Licensor may permit other manufacturers of telephones and/or PDAs to sponsor one or more of Artist's concerts on the Tour in Mexico, Central America and South America. Accordingly, none of the terms of paragraph 4(a) of this Exhibit shall not be applicable to such concerts.

<u>EXHIBIT B</u>

**TERMS AND CONDITIONS**

5.     **ROLLINGSTONES.COM**:

(a)     Licensee shall embed in the Telephone a hyperlink to rollingstones.com.

(b)     Licensor agrees that each purchaser of the Telephone will be given a 30-day free trial membership in the rollingstones.com Platinum Club.

(c)     Licensor agrees that the Telephone will be promoted on rollingstones.com from the launch of the Telephone through the end of the Term. Licensee Licensor agrees that the Album will be promoted on Licensee's WAP sites and websites throughout the end of the Term and that the Tour will be promoted on Licensee's WAP sites and websites for the duration of the Tour, provided that such promotion shall be subject to Licensor's prior written approval.

(d)     Licensor and Licensee agree that the Telephone will be made available for purchase through rollingstones.com, provided that Licensor has made appropriate arrangements with the applicable carrier or carriers or another re-seller of the Telephone therefor.

6.     **ADDITIONAL CONSIDERATION TO LICENSOR**:

(a)     Subject to receiving Licensor approval of all required Collateral Materials, Licensee hereby commits to expend, incur or cause to be spent or incurred in respect of or throughout the Authorized Channels of Distribution no less than $5,000,000 for the purchase or provision of advertising (the "Media Spend"). Included in this amount will be all marketing production and development matters, the entire cost or value of any direct or indirect advertising in respect of, related to or referencing the Telephones, as well as the fair value of bundled or non-invoiced marketing initiatives (e.g., usage of the Times Square board to air the Video Clip). At the end of the Term, Licensee will provide to Licensor reasonably verifiable evidence that at least $5,000,000 was spent in the Media Spend. At such time, Licensee shall pay Licensor the amount, if any, by which the Media Spend is less than $5,000,000.

(b)     Promptly after the Telephone is manufactured, Licensee will provide Licensor with fifty (50) Telephones at no charge.

7.     **PRESS RELEASE**: Licensee and Licensor will issue a joint press release regarding the Telephone, provided that the content of the press release is mutually agreed.

8.     **THIRD PARTY RIGHTS**.

(a)     <u>Ringtones</u>: Licensor acknowledges that Licensee may desire to embody in the Telephone ringtones derived from Artist's recordings and musical compositions contained thereon written by Artist. Licensee acknowledges that Licensor is not granting to Licensee the right to create such ringtones under this Agreement, and that, if Licensee elects to embody such ringtones in the Telephone, it will be necessary for Licensee to obtain such rights from the companies that control such rights. However, Licensor agrees to use reasonable efforts to assist Licensee in obtaining such rights, provided that Licensor approves the recordings and compositions to be contained in the ringtones.

(b)     <u>Radio Commercials</u>: Licensor acknowledges that Licensee may desire to embody in the radio advertisements for the Telephone one or more of Artist's recordings and

<u>EXHIBIT B</u>

**TERMS AND CONDITIONS**

musical compositions contained thereon written by Artist. Licensee acknowledges that Licensor is not granting to Licensee the right to use such recordings and compositions in such advertisements under this Agreement, and that, if Licensee elects to embody such compositions in such advertisements, it will be necessary for Licensee to obtain such rights from the companies that control such rights. However, Licensor agrees to use reasonable efforts to assist Licensee in obtaining such rights, provided that the recordings entitled "Rough Justice" and "Streets Of Love" from the Album are the recordings/compositions that will be used in such advertisements and provided that each such advertisement is approved by Licensor in writing.

(c)    <u>Lyrics</u>: Licensor acknowledges that Licensee may desire to embody in print advertisements for the Telephone lyrics from one or more of the musical compositions written by Artist. Licensee acknowledges that Licensor is not granting to Licensee the right to use such lyrics in such advertisements under this Agreement, and that, if Licensee desires to embody such lyrics in such advertisements, it will be necessary for Licensee to obtain such rights from the companies that control such rights. However, Licensor agrees to use reasonable efforts to assist Licensee in obtaining such rights, provided that the applicable lyrics and such advertisements are approved by Licensor in writing.

9.    **COPYRIGHT AND TRADEMARK NOTICES.**

(a)    Licensee's use of any Licensed Property shall inure exclusively to the benefit of Licensor, and Licensee shall not acquire any rights therein. Licensee recognizes the value of the goodwill associated with the Licensed Properties, and that the Licensed Properties have acquired secondary meaning in the mind of the public. Licensee agrees to never contest the rights of Licensor in such Licensed Properties or the validity of the license herein granted to it. Licensee shall not at any time apply in the Territory or anyplace else for any registration of any copyright, trademark or other designation or claim of right which would affect the ownership or rights of Licensor in and to the Licensed Properties or file any document with any governmental authority to take any action which would affect any of such ownership or rights of and to the Licensed Properties, or assist anyone else in doing so.

(b)    The applicable notice designated by Licensor must appear on the Telephone and the Collateral Material, unless otherwise agreed in writing by Licensor. The applicable notice for registered trademarks shall be ®. With regard to copyright notices, Licensor shall advise Licensee of such notice at the time it provides or approves the applicable copyrighted work.

(c)    To ensure protection of the Licensed Properties, Licensee agrees that trademarks arising out of the Licensed Properties will be displayed in a form and manner approved by the Licensor.

(d)    In the event that Licensor permits Licensee to make any additions to, and new renderings, modifications or embellishments of the Licensed Properties, the right to do so being subject to the prior written approval by Licensor, all such additions to, and new renderings, modifications or embellishments of the Licensed Properties, notwithstanding their invention, creation and use by Licensee or its agents, shall be and remain the property of Licensor, and Licensor may use, and license others to use the same, subject only to the provisions of this Agreement. Licensee shall enter into written agreements with all of its independent contractors (i) providing that all artwork and designs created by them with respect to the Licensed Properties shall be the property of Licensor either as works for hire under United States

EXHIBIT B

**TERMS AND CONDITIONS**

copyright law, and (ii) obligating them to assign all rights in such artwork and designs to Licensor. Upon the request of Licensor, Licensee shall submit to Licensor for Licensor's approval copies of all such agreements prior to use thereof. Licensee shall not permit any of its employees or independent contractors to obtain or reserve, by written or oral agreement or otherwise, any rights as "authors" or "inventors" of any such artwork or designs (as such terms are used in present or future United States copyright and/or patent statutes or judicial decisions). Licensee shall furnish to Licensor at Licensor's request, full information concerning the invention and creation of such artwork and designs, together with the originals of assignments of all rights therein obtained from all such third parties to Licensor.

(e)    In the event Licensee shall manufacture, design or produce any Telephone or Collateral Material that omits notice of copyright or other notices reasonably required by Licensor, or Licensee shall distribute, offer for sale or sell the Telephone without Packaging approved by Licensor and which is materially non-compliant with Licensor's requirements consistent with the terms of the Agreement, Licensor shall have the right to terminate this Agreement upon written notice to Licensee. Licensee shall have thirty (30) days from receipt of such notice to cure such omission if and only if (i) the notice and/or packaging has been omitted from no more than a relatively small number of Telephone or Collateral Material, and (ii) a reasonable effort is made by Licensee to add the notice and/or packaging to all Telephones and Collateral Material distributed to the public. In the event that such omission is not cured within such thirty (30) day period, the Agreement shall terminate immediately without further notice.

(f)    Licensee shall assist Licensor, at Licensor's request and expense, in the procurement and maintenance in the Territory of Licensor's rights in the Licensed Properties (including trademark and copyright protection). In connection therewith, Licensee shall execute and deliver to Licensor in such form as it may reasonably request, all instruments necessary to (i) effectuate copyright and trademark protection, (ii) record Licensee as a registered user of any trademarks comprising the Licensed Property pursuant to this Agreement, or (iii) cancel any such registration. Such registration shall be handled by attorneys selected or approved by Licensor. Licensor makes no warranty or representation that trademark or copyright protection in the Licensed Property shall be secured by way of registration in the Territory.

(g)    Licensor and Licensee shall cooperate to ensure that third parties may not unlawfully infringe on or imitate the Licensed Properties or engage in any acts of unfair competition involving the Licensed Properties. Licensee shall promptly notify the Licensor of any such infringements, imitations, or acts by third parties that comes to its attention. Licensor shall have the exclusive right, exercisable at its discretion, to institute in its own name and to control, all actions against third parties relating to a Licensor's copyrights, trademarks, and other proprietary rights in and to the Licensed Properties, at Licensor's expense. With respect to any such actions, Licensor shall employ counsel of its own choice to direct the handling of the litigation and any settlement thereof. Licensor shall be entitled to receive and retain all amounts awarded, if any, as damages, profits or otherwise in connection with such suits. Licensee shall not, without Licensor's prior written consent, institute any suit or take any action on account of such infringements, imitations or unauthorized uses. If, with Licensor's written consent, Licensee institutes, at its sole cost and expense, such a suit or action, Licensee shall be entitled to recover all reasonable costs and expenses in such suit or action from any financial recovery awarded or obtained, in addition to all recovery of all direct, out-of-pocket damages incurred by the Licensee, and shall promptly remit to Licensor fifty percent (50%) of

EXHIBIT B

**TERMS AND CONDITIONS**

the balance. Licensor shall incur no liability to Licensee by reason of Licensor's failure or refusal to prosecute, or by Licensor's refusal to permit Licensee to prosecute, any alleged infringement by third parties, nor by reason of any settlement to which Licensor may agree.

(h)     Licensee shall not use the Licensed Properties other than as permitted hereunder and, in particular, shall not incorporate the Licensed Properties in the Licensee's corporate or business name in any manner whatsoever. Licensee agrees that in using the Licensed Properties it will in no way represent that it has any rights, title and/or interest in or to the Licensed Properties other than those expressly granted under the terms of this Agreement. Licensee further agrees that it will not use or authorize the use, either during or after the Term, of any configuration, trademark, trade name, or other designation confusingly similar to the Licensed Properties.

(i)     Licensee agrees that it is prohibited from seeking or obtaining a trademark registration for the Licensed Properties, or any portion thereof, in the Territory or any other country. Licensee agrees that it shall not acquire and will not acquire any rights in any of the Licensed Properties other than as a licensee of the Licensed Properties for the Telephone and Collateral Materials to be marketed and sold through the Authorized Channel of Distribution in the Territory. Licensee further agrees that any application for registration filed by or on behalf of Licensee for any of the Licensed Properties in any country in the world, and any resulting registration, shall be held in trust by Licensee for the sole and exclusive benefit of Licensor, and that Licensee shall immediately transfer any and all rights it may have acquired in any of the Licensed Properties to Licensor.

10.     **OWNERSHIP.** Licensor warrants and represents that it has the right to grant the license granted hereunder according to the terms and conditions hereof, and that same, along with copyright and trademark notices as required will not infringe any third party rights. Licensee acknowledges that the Licensed Properties are owned solely and exclusively by Licensor or its licensors. Artwork that is created by Licensee will immediately become the property of Licensor to the extent that it incorporates any of the Licensed Properties, and Licensor shall be entitled to use and license the use of the same by others, unless restricted by this Agreement. To accomplish this, Licensee hereby assigns transfers and conveys to Licensor all rights (including copyrights) in such Artwork and the associated goodwill which are or may be obtained, expanded or created by Licensee in exercising the license granted by this Agreement. However, in no event shall the Licensor acquire any interest or license in respect of any of the marks, copyright or other intellectual property of the Licensee. Licensee shall execute any instruments reasonably requested by Licensor to confirm the foregoing, subject to the reasonable approval of Licensee's counsel. In the event Licensee fails or refuses for any reason to execute and deliver documents required by Licensor for the purpose of vesting and protecting Licensor's ownership interests, then Licensee hereby irrevocably appoints Licensor as its attorney-in-fact to execute such instruments in its name on its behalf, which appointment is coupled with an interest and shall be irrevocable. Licensee's use of the Artwork or Licensed Properties shall inure to the sole and exclusive benefit of Licensor and Licensee shall not at any time acquire any rights in the Licensed Properties by virtue of any use it may make of same. If Licensee employs third parties who are not employees of Licensee to make contribution to the creation of any such Artwork so that they might be deemed to be "authors" or "inventors" thereof as used in any applicable copyright laws, then Licensee at its sole expense, agrees to obtain from such parties and furnish to Licensor a full written assignment of rights in such Artwork on Licensor's standard assignment form.

<u>EXHIBIT B</u>

**TERMS AND CONDITIONS**

11.    **RESERVED RIGHTS:** Licensor reserves all rights in the Licensed Properties and all other rights not expressly granted to Licensee hereunder. Licensor shall not be prevented from granting third parties the right to use the Licensed Properties in any manner whatsoever, except as otherwise expressly provided in this Agreement. Licensee acknowledges that the license granted herein does not include any ownership right, title, or interest in or to the Licensed Properties nor to any copyrights, patents, and/or trademarks therein or associated therewith. For further specificity, Licensee shall not acquire any rights or licenses in any properties of any parties other than the Licensed Properties, all of which are expressly reserved to Licensor or its licensors.

12.    **GOODWILL.** Licensee recognizes the great value of the goodwill associated with the Licensed Properties and acknowledges that such goodwill belongs exclusively to Licensor and that the Licensed Properties have acquired a secondary meaning in the mind of the public. Licensee further recognizes and acknowledges that a breach by Licensee of any of its covenants, agreements or undertakings hereunder will cause Licensor irreparable damage which cannot be readily remedied in damages in an action at law, and may, in addition thereto constitute an infringement of Licensor's rights in the Licensed Properties, thereby entitling Licensor to equitable remedies, costs and reasonable attorney's fees.

13.    **WITHHOLDING TAXES**.

        (a)     Licensee shall be entitled to deduct and withhold deductions, charges or withholdings ("Withholding Taxes") from any amounts payable to Licensor under this Agreement if and solely to the extent that such deduction or withholding is required under applicable law. In the event that Licensee intends to deduct or withhold any Withholding Taxes, it shall advise Licensor of such determination and its basis therefor prior to actually deducting and withholding the Withholding Taxes. In the event Licensee shall so deduct or withhold Withholding Taxes from amounts payable to or for the benefit of Licensor hereunder, Licensee (i) shall pay to or deposit with the appropriate taxing authority in a timely manner the full amount of Withholding Taxes it has deducted or withheld, (ii) shall provide to Licensor within thirty (30) days of the payment or deposit thereof evidence of payment of such Withholding Taxes to, or the deposit thereof with, the appropriate taxing authority and a statement setting forth the amount of Withholding Taxes deducted or withheld and the applicable rate, and (iii) shall forward to Licensor as soon as possible any official tax receipts or other documentation with respect to the payment or deposit of the deducted or withheld Withholding Taxes as my be issued from time to time by the appropriate taxing authority.

        (b)     Notwithstanding paragraph 13(a) of this Exhibit, Licensee shall not withhold any Withholding Taxes (or where appropriate shall withhold Withholding Taxes at a permissible lower rate than is generally applicable) from amounts payable hereunder to or for the benefit of Licensor if Licensee has been timely provided with the Prescribed Forms (as defined below) for the applicable period.

        (c)     For the purposes of this Agreement, the term "Prescribed Forms" shall mean such duly executed form(s) or statement(s) as may from time to time be prescribed by applicable law and which pursuant to the applicable provisions of (i) any applicable income tax treaty as then in effect, or (ii) any applicable rule or regulation permitting Licensee to make payments of amounts required to be paid hereunder to Licensor free of withholding (or subject to withholding at a lower rate than is generally applicable).

EXHIBIT B

**TERMS AND CONDITIONS**

(d)     Licensee shall fully cooperate with Licensor and shall provide any information or documentation reasonably requested by Licensor for the purpose of (i) assisting Licensor in obtaining any applicable refunds, reimbursement, credits or deduction for the Withholding Taxes or (ii) satisfying any information reporting requirements.

(e)     In the event Licensee is in breach of any of the foregoing provisions of this paragraph 13, Licensee shall be liable to and shall immediately reimburse Licensor for the Withholding Taxes improperly deducted from the amounts otherwise payable to Licensor under this Agreement and/or any losses, damages or claims suffered by Licensor as a result of such breach.

14.    **MANUFACTURE, DISTRIBUTION AND SUB-LICENSING.**

(a)     The Licensed Properties may only be used in connection with the manufacture, actual packaging and advertising, promoting and publicizing of the Telephone.

(b)     Licensee may sell the Telephone solely via an Authorized Channel of Distribution.

(c)     Other than Licensee's marks and third party marks normally included on or in connection with Licensee's telephone products, the Licensed Properties shall not be used in conjunction with any other licensed name, character, symbol, design, likeness or literary or artistic material, except that actual representations of Telephone and its packaging may be shown in advertising showing other articles sold by Licensee, provided such use is not made in a manner that may be likely to cause doubt or confusion in the minds of the public as to the ownership of the Licensed Properties, and in no event may the Telephone be packaged for sale with other products other than accessories to the Telephone.

(d)     Without limiting the scope of the licenses and warranties provided by Licensor in respect of the Licensed Properties, Licensee will be responsible for obtaining, at its sole expense, all licenses, advertising clearances, registrations, permits, authorizations or approvals required for performance of its rights and obligations hereunder.

(e)     Licensee shall not sell or authorize the sale of any of the tickets to the Concert and shall only be used for Licensee's internal-company purposes and for promotional activities related to the sale of the Telephone (provided that such activities are approved by Licensor in writing) and shall not be resold.

15.    **REPRESENTATIONS & WARRANTIES.**

(a)     Licensor represents and warrants to Licensee as follows: (i) Licensor owns or controls all rights in and to the Licensed Properties; and (ii) Licensor has the full right, authority and power to enter into this Agreement and to perform all its obligations hereunder. Licensor makes no representation or warranty as to the amount of receipts Licensee will derive or as to the quality or success of the Telephone.

(b)     Licensee represents and warrants to Licensor as follows: (i) Licensee has full power and authority to enter into this Agreement and perform its obligations herein; (ii) Licensee's execution, delivery, and performance of this Agreement will not infringe upon the rights of any third party or violate the provisions of any agreement to which Licensee is a party;

EXHIBIT B

**TERMS AND CONDITIONS**

(iii) Licensee will not attack the title of Licensor in and to the Licensed Properties or any copyright or trademark pertaining thereto, nor will Licensee attack the validity of the license granted hereunder; (iv) Licensee will not harm, misuse or bring into disrepute the Licensed Properties; (v) Licensee will not create any expenses chargeable to Licensor without the prior written approval of Licensor, which approval is exercisable in Licensor's sole discretion; (vi) Licensee will comply with all laws and regulation relating or pertaining to the manufacture, sale, advertising or use of the Telephone and maintain the highest quality and standards of Licensee in effect as of the date of this Agreement; and (vii) without limiting paragraph 8 of this Exhibit and except with respect to the Licensed Property, Licensee shall obtain all necessary third party rights, licenses, clearances and authorizations (individually and collectively, the "Third Party Consents") in connection with musical compositions, photographs, likenesses, trademarks, service marks, audio recordings, audiovisual footage and other intellectual property contained in the Telephone and the Collateral Material. All Third Party Consents shall be subject to Licensor's prior written approval.

16.    **INDEMNIFICATIONS.**

    (a)    During and after the Term, Licensor shall indemnify and hold Licensee and its parent, subsidiaries, affiliates, officers, directors, representatives, employees and agents harmless from any loss, liability, damage, cost or expense (including counsel fees reasonably incurred), arising out of any third-party claims or suits which may be brought or made against Licensee by reason of the breach by Licensor of the Agreement, including the warranties or representations as set forth herein. The foregoing indemnity shall not be construed to cover any claim with respect to which Licensee has committed to indemnify Licensor under paragraph 16(b) of this Exhibit.

    (b)    During and after the Term, Licensee shall indemnify and hold harmless Licensor, Artist, and their respective parents, subsidiaries, affiliates, officers, directors, representatives, employees and agents, and all persons whose names and/or likenesses are licensed hereunder harmless from any loss, liability, damage, cost or expense (including counsel fees reasonably incurred), arising out of any third-party claims or suits (each a "Claim") which may be brought or made arising out of or in connection with (i) the design, manufacture, packaging, distribution, shipment, advertising, promotion, sale, or exploitation of the Telephone, or (ii) any such claim or action that is contrary to any agreement, representation, warranty, or other obligation made or undertaken by Licensee under this Agreement. The foregoing indemnity shall not be construed to cover any claim with respect to which Licensor has committed to indemnify Licensee under paragraph 16(a) of this Exhibit.

    (c)    The persons and entities entitled to be indemnified under paragraphs 16(a) and 16(b) of this Exhibit (individually and collectively, "Indemnitee") shall (i) promptly inform the indemnifying party under such paragraphs ("Indemnitor") of each claim, suit or proceeding with respect to which it seeks indemnity, (ii) furnish to the Indemnitor a copy of each communication, notice or other action related to such claim, suit or proceeding, and (iii) give the Indemnitor the authority, information and reasonable assistance necessary to settle or litigate such claim, suit or proceeding, using counsel selected by the Indemnitor (provided, however, that the Indemnitee shall have the opportunity to participate in the defense of such suit or proceeding with counsel of its choice, at the Indemnitee's sole cost). Any settlement of any such claim, suit or proceeding by the Indemnitor that imposes any requirements on the Indemnitee or which involves agreements other than the payment of money by the Indemnitor and receipt of a full

EXHIBIT B

**TERMS AND CONDITIONS**

release for the benefit of the Indemnitor and the Indemnitee, shall be subject to the Indemnitee's written consent.

17.    **INSURANCE.** Licensee shall at all times during the Term and for three (3) years thereafter, obtain and maintain at its own expense, from a qualified insurance carrier with a Best rating of "A" insurance, including products, personal injury, advertising, errors and omissions, and contractual liability coverage, which includes Licensor as an additional insured, along with its subsidiaries, affiliates, officers, directors, employees, representatives and agents. The amount of coverage shall be not less than the amount specified in paragraph 10 of the Underlying Agreement combined single limit (with no deductible amount) for each single occurrence. The policy shall provide for thirty (30) days written notice to Licensor from the insurer by registered or certified mail, return receipt requested, in the event of any modification, cancellation or termination. Upon execution of this Agreement, Licensee shall furnish Licensor with a certificate of insurance issued by the carrier evidencing the same. In no event shall Licensee manufacture, advertise, distribute or sell the Telephone prior to Licensor's receipt of such certificate of insurance.

18.    **DEFAULT.**

(a)    In the event of a material breach of any obligation hereunder by either party, the non-defaulting party shall have the right to terminate the Term by giving written notice of termination to the defaulting party. Such notice shall be effective fifteen (15) days after notice is mailed to the defaulting party unless the defaulting party in the interim has remedied the Default and reasonably satisfied party providing notice that the Default has been remedied. Upon such termination by the Licensor due to an uncured default of the Licensee, the entire advance payment or minimum guarantee or royalty shall immediately become due and payable to Licensor, and Licensor shall be entitled to retain all amounts previously received as minimum liquidated damages. Notwithstanding the foregoing, the so-called "cure" period for any default on compensation due and payable to Licensor hereunder shall be five (5) business days.

(b)    Notwithstanding anything to the contrary contained in the foregoing paragraph 18(a) of this Exhibit, either party shall have the right to terminate the Term immediately and without notice in the event that the other party shall be unable to pay its debts when due or shall make any assignment for the benefit of creditors, or shall file any petition under the bankruptcy or insolvency laws of any jurisdiction, or shall have or suffer a receiver or trustee to be appointed for its business or property, or be adjudicated a bankrupt or an insolvent. In the event of such notice being provided to the Licensee, all Licensee's rights hereunder, including the right to distribute, manufacture, advertise, promote, market or publicize the Telephone, shall terminate immediately and revert to Licensor.

19.    **LIMITATION OF REMEDIES.**

(a)    Subject to paragraph 19(b), in no event will either Licensor or Licensee, or the officers, directors, affiliates, employees, representatives, agents, members or shareholders of each be liable (either in contract, warranty, tort, or otherwise) to the other or any of its officers, directors, affiliates, employees, representatives, members, agents, or shareholders for any consequential, incidental, or indirect damages, including costs, profits, or for any exemplary or punitive damages.

EXHIBIT B

**TERMS AND CONDITIONS**

(b)    Paragraph 19(a) shall not apply to any use by Licensee of any name or likeness of the individual members of Artist, or any trademark, service mark, copyright or other intellectual property right, owned, directly or indirectly, by Artist or any affiliate thereof or otherwise associated with Artist, not expressly authorized under, or beyond the scope of, the Agreement.

20.    **TERMINATION & EXPIRATION PROCEDURES.** Upon the earlier of expiration or termination of the Term, the following will apply:

(a)    Sell-Off: Licensee shall have the right to dispose of any inventory of the Telephone that is then on hand at the end of the Term for the Sell-Off Period specified in paragraph 7 of the Underlying Agreement, provided that: (i) this Agreement has not been terminated by reason of Licensee's Default; and (ii) Licensee's usual prices for the Telephone are charged therefore, and, accordingly, the Telephone will not be sold on a distress or close-out basis. During the Sell-Off period, Licensee may use or license the use of the Licensed Properties in any advertising, marketing, promotion or publicity. At the end of the Sell-Off Period, Licensee shall immediately rework or modify its inventory of Telephones such that they do not contain any of the Licensed Property (i.e., removal of the embossed battery door).

(b)    Reversion of Rights: Subject to paragraphs 20(a) and 20(c) of this Exhibit, all rights granted to Licensee hereunder shall revert to Licensor, and Licensor shall be free to license others to use the Licensed Properties in connection with the manufacture, sale and distribution of telephones, and Licensee shall refrain from further use of the Licensed Properties or any further reference, direct or indirect, thereto. It shall not be a violation of any right of Licensee if Licensor should at any time during the Term enter into confidential negotiations with another to license use of the Licensed Properties in respect to telephones within the Territory, provided that, in the event that the license granted to Licensee under this Agreement is an exclusive license, it is contemplated that such prospective license shall commence after the end of the Term and no public announcement of such license shall be made prior to the end of the Term.

(c)    Notwithstanding anything contained in this Agreement, after the Term, Licensee shall have a limited license to utilize an agreed stock of product and packaging photos in physical and electronic/web format and shall be entitled to use the phrase "Rolling Stones Blackberry" to identify the Telephone solely for purposes of support, warranty, and historical product descriptions.

21.    **INVENTORY.** At the request of Licensor, Licensee shall submit a statement showing the number of Telephones on hand or in process. In addition, Licensor shall have the right to take a physical inventory to ascertain or verify such inventory statement and Licensee shall allow Licensor or its representative to enter Licensee's premises and all manufacturing facilities during regular business hours, upon prior notice, for the purpose of inspecting the Telephones, the Collateral Materials, and the facilities in which they are manufactured and packaged. In the event that the quality standards referred to in this Agreement are not met, Licensee shall, upon written notice from Licensor, discontinue the manufacture and distribution of the Telephone and the Collateral Material related thereto, unless Licensee shall have remedied such failure of quality to Licensor's satisfaction within thirty (30) days after Licensee's receipt of notice thereof; failure to effect such remedial measures shall entitle Licensor to terminate the Term upon notice to Licensee, without waiving any other right or remedy available to Licensor.

EXHIBIT B

**TERMS AND CONDITIONS**

22.    **NOTICES.** All notices, demands, contracts or waivers hereunder shall be given in writing by overnight air courier (with an acknowledgement of receipt) to the address indicated above or as otherwise indicated in writing by a party hereto. One (1) business day from the date of overnight air courier handling shall be deemed to be the date of service for courier handled notices. In order for a notice to Licensor to be effective, simultaneous copies shall be rendered by Licensee to:

If to Licensor

Research In Motion
185 Columbia Street West
Waterloo, Ontario N2L 5Z5
Canada

Attention: President and CEO

With a copy to:

Research In Motion Limited
185 Columbia Street West
Waterloo, Ontario N2L 5Z5
Canada
Attention: Karima Bawa, Legal Department

If to Licensee:

c/o Chapman, Bird, Grey & Tessler, Inc.
1990 South Bundy Drive, Suite 200
Los Angeles, California 90025

With copies to:

Richard I. Leher, Esq. and
to Mario F. Gonzalez, Esq.
Greenberg Traurig LLP
2450 Colorado Avenue, Suite 400E
Santa Monica, CA 90404

The Next Adventure Ltd.
Attention: Eric Kert
214 King Street West, Suite 510
Toronto, Ontario
M5H 3S6, Canada
Fax: 416 922 9877

Concert Productions International (USA) LLC
Attn: Steve Howard
236 Avenue Road
Toronto, Ontario M5R 2J4
Fax: 416 929-7350

23.    **NO PARTNERSHIP, ETC.** This Agreement does not constitute a partnership or joint venture between Licensor and Licensee. Neither party shall have any right to obligate or bind the other party in any manner whatsoever. Nothing herein contained shall give, or is intended to give, any rights of any kind to any third persons.

24.    **ASSIGNMENT.** This Agreement is personal to Licensee. Licensee shall not sell, assign, license, sublicense or otherwise transfer any of its rights hereunder, and any such purported assignment, license, sublicense or other transfer shall be deemed null and void and without force or effect; provided that the foregoing shall not be construed to limit Licensee's right to authorize third parties to sell, advertise, promote, market and publicize the Telephone in accordance with the Agreement. No rights hereunder shall develop by operation of law or otherwise upon receiver, liquidator, trustee or other party. Licensor reserves the right to assign

<u>EXHIBIT B</u>

**TERMS AND CONDITIONS**

this Agreement to any third party and to hypothecate or pledge this Agreement as collateral for any purpose. In the event of any such assignment, Licensee shall pay monies due to Licensor hereunder as directed by Licensor. This Agreement shall bind and inure to the benefit of Licensor, its successors, executors and assigns.

25.     **WAIVER, MODIFICATION, ETC.** Any waiver, modification, discharge or cancellation of any term or condition of this Agreement must be in writing and signed by both parties.

26.     **CONSTRUCTION.** This Agreement shall be construed in accordance with the internal substantive laws of the State of New York. The courts located in the County of New York (state and federal), only, will have jurisdiction of any controversy regarding this Agreement; any action or other proceeding which involves such a controversy will be brought in those courts and not elsewhere. Notwithstanding the foregoing, the foregoing provisions shall not be applicable in connection with any legal action taken by Licensor which includes an attempt by Licensor obtain injunctive or other equitable relief to prevent or remedy any breach or threatened breach by Licensee of this Agreement. Licensee hereby consents to the exclusive jurisdiction of any state or federal court empowered to enforce this Agreement in the County of New York, New York, and waives any objection thereto on the basis of personal jurisdiction or venue.

27.     **SEVERABILITY.** Nothing in this Agreement shall be construed to require the commission of any act contrary to law, and wherever there is a conflict between any provisions of this Agreement and any statute, law, ordinance, order or regulation contrary to which the parties hereto have no legal right to contract, such statute, law, ordinance, order or regulation shall prevail; provided that, in such event, (a) the provision of this Agreement so affected shall be limited only to the extent necessary to permit the compliance with the minimum legal requirements, (b) no other provisions of this Agreement shall be affected thereby, and (c) all such other provisions shall remain in full force and effect. The parties hereto shall negotiate in good faith to replace any invalid, illegal or unenforceable provision (the "Invalid Provision") with a valid provision, the effect of which comes as close as possible to that of the Invalid Provision.

28.     **CONFIDENTIALITY.** Other than as may be required by any applicable law, government order or regulation, or by order or decree of any court of competent jurisdiction, Licensee and Licensor shall not publicly divulge or announce, or in any manner disclose to any third party, any information or matters revealed to the other pursuant to this Agreement or any of the specific terms and conditions of this Agreement (including the Licensing Fee). Licensee and Licensor acknowledge that breach of the foregoing will result in irreparable injury to Licensor and Artist, or the Licensor respectively, for which no adequate remedy is available at law and which is not fully compensable in money damages alone. Accordingly, in such event, the non-defaulting party shall be entitled to injunctive (or other equitable) relief in addition to any money damages to which the non-defaulting party may be entitled.

29.     **FURTHER ASSURANCES.** The parties hereto shall execute such further documents and perform such further acts as may be necessary to comply with the terms of this Agreement and consummate the transactions herein provided.

30.     **HEADINGS.** The headings contained in this Agreement are for convenience and reference purposes only. They do not form a part hereof and shall not affect the meaning or interpretation of this Agreement.

<u>EXHIBIT B</u>

**TERMS AND CONDITIONS**

31.    **PROMOTIONAL VALUE.** Licensee acknowledges that Licensor is entering into this Agreement not only in consideration of the Fee, but also for the promotional value to be secured by Licensor for the Licensed Properties as a result of the manufacture, sale and distribution by Licensee of the Telephone and the advertising and promotion of the Telephone by Licensee.

32.    **CURRENCY.** All references to currency in this Agreement shall refer to the currency of the United States.

33.    **ATTORNEYS' FEES.** In the event any action is brought for any breach or default of any of the terms of this Agreement, or otherwise in connection with this Agreement, the prevailing party to any such action which reaches a final, non-appealable judgment, shall be entitled to recover from the other party all costs and expenses incurred in that action, including without limitation reasonable attorneys' fees costs actually incurred.

34.    **ENTIRE AGREEMENT.** All references in this Agreement to "this Agreement," "hereof," "herein" and words of similar connotation include all exhibits attached hereto, unless specified otherwise. The parties hereto intend this Agreement as a final expression of their understanding and agreement with respect to the subject matter hereof and as a complete and exclusive statement of the terms thereof; this Agreement supersedes all prior and contemporaneous negotiations, understandings, and agreements between the parties hereto with respect to the subject matter hereof, including the License Agreement, between on the one hand, Licensor, Promolane B.V., and Concert Productions International (USA) LLC and, on the other hand, Licensee, of even date herewith. No draft or addition, deletion, revision, change or other alteration in or to drafts of this Agreement prepared prior to the execution of this Agreement shall be referred to by any of the parties hereto in any lawsuit in which the construction, interpretation or meaning of this Agreement is in dispute or otherwise be used for purposes of construing or interpreting any of the terms, provisions or language of this Agreement in adjudicating or otherwise resolving any such lawsuit. The parties acknowledge and agree that no party hereto has made any representations or promises in connection with this Agreement or the subject matter hereof not contained herein. Whenever examples are used in this Agreement with the words "including," "for example," "e.g.," "such as," "etc. " or any derivation thereof, such examples are intended to be illustrative and not in limitation thereof.

35.    **COUNTERPARTS.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and facsimile copies or photocopies of signatures shall be as valid as originals.

**END OF THE TERMS AND CONDITIONS**

EXHIBIT C

**ACCOUNTING: AUDITING**

1.      Licensee shall (a) render accounting statements ("Accounting Statements") to Licensor on a quarterly basis within thirty (30) days after the close of each calendar quarter, and (b) remit payments of Royalties due Licensor, if any, along with the applicable Accounting Statement. Royalties shall be paid in U.S. Dollars and acceptance thereof by Licensor shall not prelude Licensor from questioning the correctness of same at any time. All Royalties shall be made without set-off of any amount whatsoever, whether based upon any claimed debt or liability of Licensor to Licensee. All payments of the Advance and the Royalties and any other payments to Licensor under this Agreement shall be made by wire transfer to the bank account specified in paragraph 11 of the Underlying Agreement. All Accounting Statements shall be sent to Licensor's address as indicated in paragraph 1 of the Underlying Agreement (until such time as Licensor notifies Licensee of a different address).

2.      Licensee shall keep and maintain accurate books of account and records covering all transactions relating to this Agreement. Licensor shall be entitled to examine, copy and make extracts and summaries of such books and records at any time or times during or after the Term during reasonable business hours and upon five (5) days prior written notice to Licensee. All such books and records shall be retained by Licensee for a minimum of three (3) years after the Term. If Licensor's duly authorized representative discovers a deficiency in the Royalties paid to Licensor for any period under examination (a "Deficiency"), Licensee shall promptly pay the Deficiency to Licensor, plus the interest provided in paragraph 3 of this Exhibit, and, if the Deficiency is in an amount equal to or in excess of five percent (5%) of the Royalties paid to Licensor for period being examined, Licensee shall also promptly reimburse Licensor for all costs and expenses incurred by Licensor in connection with such examination.

3.      Without prejudice to any other rights of Licensor hereunder, time is of the essence regarding all payments due hereunder. Without waiving any other right or remedy available to Licensor, Licensee shall pay interest compounded annually on any Deficiency, as well as on all other delinquent payments hereunder, at the lesser of (a) fifteen percent (15%), or (b) the highest rate of interest allowable under law.